UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

FLORA R.S. SELBY,

         Plaintiff,

v.                     Case No.  6:05-cv-719-Orl-GRJ

TYCO HEALTHCARE GROUP, L.P.,

         Defendant.
_____/

## MEMORANDUM DECISION AND ORDER

This lawsuit was brought by Plaintiff, Flora R.S. Selby ("Selby") against Tyco Healthcare Group, L.P. ("Tyco") for retaliation under Title VII, 42 U.S.C. § 2000e-3(a) as a result of the termination of her employment after Plaintiff filed a complaint with the Florida Commission On Human Relations. A non-jury trial was held before the undersigned on June 13, 2007. In accordance with Fed. R. Civ. P. 52, the following constitutes the Court's findings of fact and conclusions of law.

## I.  DISCUSSION

Following the Court's Order granting in part and denying in part Tyco's Motion for Summary Judgment, the only claim remaining for trial was Plaintiff's claim for retaliation.

### *A.* *Factual Record*

The following facts were established by a preponderance of the testimony[1] and documentary evidence offered and admitted into evidence. Tyco is a manufacturer, distributor and servicer of medical devices worldwide, including needles, syringes and

---

[1] Plaintiff presented the testimony of Anthony Earl, Alan Whiteman, Gary Wooley, Anthony Vellake, Lorenzo Lane, Gregory Thompson and herself. Defendant's witnesses included Rick Valentine, Gary Wooley, Lorenzo Lane, Alan Whiteman, Meaghan Jobst and Gregory Thompson.

lancets.[2] Plaintiff, an Asian Pacific Islander, operated machinery in the grinding department of Tyco's Deland facility (formerly owned by Sherwood, Davis, and Geck until February 27, 1998) for more than fifteen years. Plaintiff performed duties as a labor grade 5 auditor, which included labor grade 6 "loading" duties when the auditor machines experienced mechanical breakdowns. However, Plaintiff was paid as a labor grade 5 auditor (a higher rate) when she performed labor grade 6 duties.

During the approximate fifteen years that Plaintiff worked for Tyco, Plaintiff received a number of disciplinary and counseling reports for problems with attendance and tardiness, performance issues and unacceptable behavior and attitude. Tyco introduced extensive evidence documenting that Plaintiff had a poor work history over an extended period of time with regard to her attendance and behavior.

For example, on December 17, 1998, Plaintiff received a counseling report for excessive attendance issues.[3] The next year on April 14, 1999, Plaintiff was counseled for using profanity in the workplace[4] and on June 24, 1999, Plaintiff was counseled for her inability to get along with coworkers and disrupting the workplace.[5] Further, during the following year on January 28, 2000 and on March 20, 2000, Plaintiff received counseling reports for tardiness and attendance issues.[6] Later that year, on June 28,

---

[2] Defendant's Exhibit 23.

[3] Defendant's Exhibit 12.

[4] Defendant's Exhibit 13.

[5] Defendant's Exhibit 14.

[6] Defendant's Exhibits 16 & 17. Plaintiff also continued to receive reports for tardiness and leaving work early as documented in an April 14, 2003 counseling report. Defendant's Exhibit 29.

2000, Plaintiff received a counseling report for turning off her machine during production and leaving her work area without finding a replacement.[7]

The performance appraisals for Plaintiff submitted into evidence also documented problems at work. On October 13, 2000 Plaintiff received a performance appraisal recommending improvement in the areas of reliability and attendance, judgment, cooperation with supervisor, and cooperation with co-workers.[8] Notably, this performance appraisal identified unacceptable behavior, including the fact that Plaintiff became upset easily, left work early after receiving warnings from her supervisor and had conflicts with co-workers.

On July 26, 2001, Plaintiff received Tyco/Healthcare/Kendall's Employee Handbook containing Tyco's personal conduct policy.[9] The employee handbook contained a personal conduct policy which provided that employees were subject to immediate discharge for the first offense for engaging in insubordinate conduct, including refusing or failing to accept job assignments given by a supervisor, and for leaving the plant without authorization from a supervisor.[10] Plaintiff acknowledged that she received the Employee Handbook.

Even after Plaintiff was provided with the employee handbook, which spelled out Tyco's personal conduct policy, Plaintiff continued to receive counseling reports. On December 18, 2001, Plaintiff received a counseling report for disrupting her department

---

[7] Defendant's Exhibit 18.

[8] Defendant's Exhibit 21.

[9] Defendant's Exhibit 22.

[10] *Id.*

by complaining about being assigned a different job duty by her Lead Set Up person.[11] The counseling report documents an incident in which Plaintiff was instructed by her Lead Set Up person to perform duties such as loading and auditing on different machines. Apparently Plaintiff became upset and was reminded that the Lead Set Up person had the authority to assign the Plaintiff to perform different duties in accordance with the needs of the department.

The events, which relate to Plaintiff's retaliation claim stem from an incident on February 14, 2004 involving Anthony Vellake, the First Shift Tech Specialist.[12] According to Vellake, he noticed that Plaintiff's machine was leaking water and requested that Plaintiff mop the water off the floor. Plaintiff became very upset and told Vellake that he was not her boss and to "get out of her face." Two days later, Plaintiff spoke with Gregory Thompson, the Human Resources Manager and Jimmy Adams, the Plant Manager, regarding Vellake's conduct. Plaintiff complained that she did not like the manner in which Vellake spoke to her and other employees. Adams advised Plaintiff that Tyco would speak to Vellake about his behavior. Thompson asked Plaintiff if her issues with Vellake could be resolved and Plaintiff responded, "yes."

Despite the fact that Plaintiff had told the Human Resources representative that the issues with Vellake could be resolved Plaintiff filed a charge of discrimination with the Florida Commission on Human Relations on March 18, 2004 citing the February 14, 2004 incident with Vellake and alleging that she had been discriminated against and

---

[11] Defendant's Exhibits 25 & 26.

[12] *See,* Defendant's Exhibit 44.

subjected to unfair terms and conditions because of her race.[13] Gregory Thompson, the human resources manager, acknowledged that Tyco was made aware of the fact that Plaintiff had filed this charge of discrimination.

Thereafter on April 6, 2004, Plaintiff received another counseling report for again leaving work early and being tardy.[14] Two days later, on April 8, 2004, Plaintiff withdrew the March 18, 2004 charge of discrimination. Plaintiff testified that Gregory Thompson from human resources drafted the letter of withdrawal. Although Thompson admitted that the letter was drafted by human resources there was no evidence offered suggesting that Plaintiff was coerced or forced in any way - either directly or indirectly - into withdrawing the charge of discrimination.

The incident that was the main focus of Plaintiff's claim occurred on April 21, 2004. The testimony presented at trial established that the following events occurred on April 21, 2004. Alan Whiteman, the Second Shift Supervisor, requested Plaintiff to work overtime in the grinding department by reporting to work at 10:00 a.m., four hours before her normal second shift. During the first shift, Plaintiff's machine experienced a mechanical breakdown. Rick Valentine, the First Shift Supervisor, and Anthony Earl, the First Shift Lead Set Up, asked Plaintiff to "load" on a different machine while the auditing machine was being repaired. Plaintiff refused. Valentine told Plaintiff that she would have to "load" until the auditing machine was working properly.

---

[13] Plaintiff's Exhibit 10. Although Plaintiff complained of race discrimination her complaint was really for discrimination based upon her national origin (Asian Pacific Islander).

[14] Defendant's Exhibit 35.

When Valentine left Plaintiff to make his supervisory rounds, Plaintiff continued to complain about having to "load." Both Gary Wooley and Lorenzo Lane, other non-supervisory employees, heard Plaintiff state that she was an auditor, not a loader and that she was going to HR or going home. Plaintiff told Earl that she was going to do auditing work or was going to leave work and go home. At that point, Earl contacted Valentine by radio and told Valentine that Plaintiff refused to "load." Thereafter, Plaintiff left the department to speak with Thompson or Meaghan Jobst, the Assistant Human Resources Manager. Neither was available so Plaintiff told Pamela Wooten, the Benefits Specialist - a non-supervisory employee - that she was leaving work and going home. The evidence was undisputed that Plaintiff never requested permission to leave the plant early from any supervisor nor did she receive authorization to leave work early from any supervisor, as required by company policy.

Plaintiff then returned to work for her regular second shift. Alan Whiteman, the Second Shift Supervisor told Plaintiff to report to the Human Resources Department. Plaintiff went to the Human Resources Department and met with Thompson and Jobst to discuss the events that led to Plaintiff leaving her first shift early that day. Plaintiff told Thompson that she became upset when Mr. Vellake told her to "load."[15] Plaintiff stated that she told Earl that she was going to HR and then going home because she was "getting sick of this." Plaintiff admitted that she did not clock out before leaving. Thompson explained to Plaintiff that it was a violation of Tyco's policy to leave in mid-

---

[15] Plaintiff, through questioning, tried to establish that Vellake demanded, in a derogatory manner, that she "load, load, load." However testimony, which the Court finds credible, from Vellake, Lane and Wooley establish that Vellake was not even present during the April 21, 2004 incident.

6


shift without permission from a supervisor. Plaintiff's only explanation was that she told Early and Wooten - both non-supervisory employees - that she was leaving. After listening to Plaintiff's explanation, Thompson and Jobst sent Plaintiff home pending an investigation of the incident.

Thompson conducted an investigation of the incident which included interviewing Valentine, Earl, Whiteman, Vellake and Wooley - all of whom Plaintiff identified as employees with knowledge of the April 21, 2004 incident. Thompson testified that based upon the interviews of the employees involved in the incident as contrasted with the information provided by Plaintiff and taking into account Plaintiff's history of leaving work early whenever she became upset with her job duties (as documented in the numerous counseling reports and performance appraisals) Thompson decided to terminate Plaintiff for leaving work early without permission and for insubordination for refusing to complete her assigned job duties. Thompson notified Plaintiff of the termination via telephone on April 27, 2004.

## *B.   Legal Analysis*

To establish a *prima facie* case of retaliation, plaintiff must prove that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and, (3) there is some causal connection between the two events.[16]

The Court concludes that Plaintiff has established a *prima facie* case. There is no dispute that Plaintiff engaged in protected activity by filing a complaint with the Florida Commission on Human Relations and no dispute that Plaintiff's termination was an

---

[16] Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000).

adverse employment action. Moreover, in view of the close proximity between the filing of Plaintiff's complaint with the Florida Commission on Human Relations on March 18, 2004 and her termination approximately one month later there is a sufficient causal link to establish a *prima facie* case.[17]

Once the Plaintiff has established a *prima facie* case the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action.[18] If the defendant offers legitimate reasons, the presumption of retaliation disappears and then the plaintiff must show by a preponderance of the evidence that the employer's proffered reasons for taking the adverse action were actually a pretext for the prohibited retaliatory conduct.[19]

The trial testimony of the witnesses and the documentary evidence submitted by Tyco establishes by a preponderance of the evidence that Tyco terminated Plaintiff for violating Tyco's personal conduct policy as a result of Plaintiff's insubordination and leaving work early without permission from her supervisor on April 21, 2004 - reasons which are legitimate and non-discriminatory reasons for Plaintiff's termination. In addition to the fact that there was substantial evidence establishing that Plaintiff was insubordinate on April 21, 2004 and left work without receiving authorization, Tyco established that this was not an isolated incident and that Plaintiff had violated Tyco's personal conduct policy several times previously. Most notably, the testimony and

---

[17] Donnellon v. Fruehauf Corp., 794 F.2d 598, 601 (11th Cir. 1986) (holding that a one month gap between protected activity and adverse action is sufficient to establish a causal connection).

[18] Sullivan v. Nat'l R.R. Passneger Corp., 170 F.3d 1056, 1059 (11th Cir. 1999).

[19] *Id*.

documentary evidence highlighted that Plaintiff had been warned previously that she could be fired for leaving the production floor without permission.

In sum, the evidence was clear and convincing that Tyco fired the Plaintiff for legitimate non-discriminatory reasons and thus the burden shifted back to Plaintiff to establish that Tyco's reasons for terminating her were pre-textual.

Plaintiff completely failed to meet her burden of establishing that Tyco's reasons for her termination were pre-textual and indeed she failed to present any evidence, whatsoever, suggesting that Tyco fired her in retaliation for filing the complaint with the Florida Commission on Human Relations on March 18, 2004 - other than the mere fact that the complaint and her termination occurred within one month of each other. While the close proximity between her protected activity and her termination might have been sufficient to overcome the hurdle of establishing a *prima facie* case, it is insufficient - standing alone - to establish that Tyco's reasons for terminating her were pre-textual and is insufficient to establish that her termination was retaliatory and in violation of law.

## II. **CONCLUSION**

Accordingly, for these reasons, the Court concludes that the greater weight of the evidence establishes that Plaintiff was fired for violating Tyco's personal conduct policies and not because she filed a complaint with the Florida Commission on Human Relations in March 2004 and, therefore, judgment is due to be entered in favor of Defendant Tyco Healthcare Group, L.P and against Plaintiff, Flora R.S. Selby.  The

Clerk is directed to enter judgment accordingly, terminate all pending motions and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on November 13, 2007.

GARY R. JONES
United States Magistrate Judge

Copies to:
 All Counsel
 *Pro Se* Plaintiff